# CHARLESTON

## STATE *v.* HOOD.

Submitted November 26, 1907.   Decided December 10, 1907.

1. HOMICIDE—*Dying Declaration—Admissibility.*
   It is no ground for excluding a dying declaration that it does not appear that the declarant believed in God and rewards and punishment after death. (p. 183.)

2. CRIMINAL LAW—*Objection to Evidence—Sufficiency.*
   A written dying declaration contains matter that is admissible, and other matter not admissible, because hearsay. There is a general objection to the admission of the paper and one item thereof, but no specific objection to matter of hearsay. It was the duty of the objector to specify the objectionable matter, and there is no error in overruling the objection to the admission of the paper for such hearsay. (p. 185.)

3. SAME—*Instructions—Withdrawal.*
   An erroneous instruction may be withdrawn from the jury with a direction from the court that it is withdrawn and is to be disregarded by the jury. (p. 186.)

4. HOMICIDE—*Affray—Duty to Retreat.*
   In case of affray, where retreat is necessary before taking the adversary's life in self defence, that retreat must be in good faith, not as a cover to execute a fixed design to kill. (p. 187.)

Error to Circuit Court, Ritchie County.

Hezekiah Hood was convicted of voluntary manslaughter, and brings error.

*Affirmed.*

J. G. St. Clair and Freer & Robinson, for plaintiff in error.

Clarke W. May, Attorney General, and S. M. Hoff, for the State.

Brannon, Judge:

This is a writ of error from a judgment of the circuit court of Ritchie county sentencing Hezekiah Hood to the penitentiary for four years upon a verdict finding him guilty of voluntary manslaughter upon an indictment against Hezekiah Hood and Henry Hood for the murder of John Barnes.

It is claimed that the court erred in allowing the dying declaration of Barnes reduced to writing to go before the jury. One objection to the dying declaration is, that it does not appear that Barnes believed in a God and rewards and punishment after death. By the common law of England want of such belief makes a witness incompetent on the principle that one who does not have such religious faith will not consider himself bound by an oath. This was so strongly embedded in the common law that it was said in a very well considered opinion in *Atwood* v. *Welton*, p. 74 of 7 Conn., that there is no adjudged case and hardly a dictum in the English books to the contrary. We may say so virtually in America, save where statute or constitution changes the rule. 2 Elliott on Ev., section 773; 1 Greenleaf on Ev., section 369; 2 Wigmore on Ev., section 1443; 30 Am. & Eng. Ency. L. (2 Ed.) 936; 92 Am. Dec. note 473. In *Perry's Case*, decided by the general court of Virginia in 1846, 3 Grat. 631, such seems to be the tacit admission, as a rule of the common law; but the court by reason of the Virginia Bill of Rights and the Virginia Act of Religious Freedom, held that this ground for the exclusion of a witness had been abrogated. It stated the broad proposition that, " No person is incapacitated from being a witness on account of his religious belief." That case quotes this language of those acts as abrogating the common law rule: "No person shall be enforced or otherwise restrained, molested or bur-

dened in his body or goods, or otherwise suffer on account of his religious opinions and belief; but all men shall be free to profess, and by argument maintain their opinions in matters of religion; and the same shall in no wise, affect, diminish, or enlarge their *civil capacities.* That religion, or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, and not by force and violence." The West Virginia Bill of Rights must have the same effect from the following language: "No religious or political test oath shall be required as a pre-requisite or qualification to vote, serve as a juror, sue, plead, appeal, or pursue any profession or employment." "No man shall be compelled to frequent or support any religious worship, place or ministry whatsoever; nor shall any man be enforced, restrained, molested, or burthened, in his body or goods, or otherwise suffer, on account of his religious opinions or belief, but all men shall be free to profess, and by argument, to maintain their opinions in matters of religion; and the same shall, in no wise, affect, diminish or enlarge their civil capacities; and the Legislature shall not prescribe any religious test whatever, or confer any particular privileges or advantages on any sect or denomination." These wide provisions plainly speak religious freedom, and forbid the disfranchisement of a person from giving evidence in the public courts in the administration of justice. The courts are a part of the government; they perform functions in such administration; and they call witnesses in doing so as indispensable to their procedure; and it is to the interest of the state that persons shall not be excluded for such a cause. The right is valuable to the citizen, a great right to bear testimony for his protection and the protection of his state or neighbor. The right is a civic right of a laudable and worthy distinction and of high value; its denial a brand of inferiority and disgrace. In *Perry's Case* we find the question, "The Constitution declares, that all men shall be free to profess, and by argument to maintain their religious opinions. Is the man who is stigmatized by the law as unworthy of belief; one who, in the language of Lord Coke, is in the condition of those who have lost '*liberam legem*,' because of his opinions, as

free to avow and defend those opinions as one who
can fearlessly enter a Court of Justice, and offer his testi-
mony to protect the property, the reputation or the life of
his neighbor? * * * * The proscibed man may suffer
in his property, or in the persons of the members of his
family. His goods may be stolen, his dwelling broken
into by the midnight robber, or burned by the incendiary;
his child may be beaten, or his wife murdered before his
face, and the offender escape because of the incapacity of the
injured man to give evidence against him. This very in-
capacity may have caused the calamity, and can he be told
that he lives under a government of equal laws? That he
has *suffered* nothing on account of his opinions?" Church
and State are separate in America. The old rule prevailed
when the government adopted and cruelly enforced one
religion, indeed one church, as the only true one; but where
the state has no religion, and religious freedom dominates,
such a rule cannot and ought not live. It is too late in these
days of liberalism to assert it. It is entirely against the
spirit and letter of American Constitutional Law.

But as Greenleaf on Ev., sec. 370, says, defect of religious
belief is never presumed, but to the contrary there is a pre-
sumption that every one reared in a christian land has such
belief. Nothing is shown as to the belief of Barnes. So says
Underhill, Crim. Ev., p. 129.

There can be no question that this dying declaration was
admissible; but it is argued here that it contained hearsay.
In his declaration Barnes stated that he started to the place
where he was shot by Hood and said: "On crossing the
hollow just beyond where I had started I met Raymond
Hanes and Archie Hanes, and they said that the Hoods,
that Hezzie Hood swore that if I, meaning John F. Barnes,
came up there to clean out them holes that he would kill
me." It may be conceded that this was inadmissible, be-
cause hearsay. A dying declaration must be such as would
be admissible if the party were living and giving evidence.
*State .v. Burnett,* 47 W. Va. 731; 4 Elliott on Ev., section
3033. Therefore hearsay cannot be rendered admissible by
being included in a dying declaration. 4 Ency. of Ev., 992.
But the defendant made a general objection to the introduc-
tion of the written dying declaration and he did not put

his finger upon that clause. He did specify one clause, but not that matter. This will not do. *Long* v. *Perine*, 41 W. Va. 314; *Warren* v. *Warren*, 93 Va. 73. Except as to another clause, his objection was general. Some of the dying declaration was plainly admissible. Where a deposition contains some matter admissible and other matter not admissible, the party objecting must specify the particular portion to which he objects. *Richardson* v. *Donehoo*, 16 W. Va. 685. If a record is offered in evidence, a part of which is objected to, the objector must specify the part objected to, or his objection is properly overruled. *Parsons* v. *Harper*, 16 Grat. 64; *Trogdon* v. *Commonwealth*, 31 Grat. 862. When a party moves the court to exclude evidence he must specify the particular evidence. Where some of it is proper the motion may be properly overruled on account of the generality of the motion. *Friend* v. *Wilkinson & Hunt*, 9 Grat. 31. "Where evidence is offered, a portion of which is admissible and a portion not, and the objection is general, the objection must be overruled." *Washington &c. R. Co.* v. *Lacey.* 94. Va. p. 463. Since writing to this point I meet with the case of *Stansbury* v. *Stansbury*, 20 W. Va. 23. In that case a will was given in evidence over a general objection. The court held that, "Where a paper is offered in evidence to the jury, and a general objection is made to its being read, and the objection is overruled, this Court will not hold such ruling to be error, if such paper could be properly read as evidence for any purpose."

The case in hand involves a large number of instructions. The court gave one, and it was before the jury while two counsel, one on each side, argued the case, and before two other counsel, one on each side, made their arguments to the jury, the court withdrew that instruction and charged the jury to disregard it entirely as if it never had been given. We must take it that jurymen are intelligent men, and can understand the direction of the judge, and have capacity not to be influenced by an instruction afterwards eliminated from the case. If this is not so, why any instructions? JUDGE HOLT, in *Osborne & Co.* v. *Francis*, on page 319 of 38 W. Va., cited authority for the statement that a court may cure errors in instructions by withdrawing, explaining or correcting them. So do Hughes on Instructions and

*Shakelford* v. *State*, 53 S. W. 884. This power, or I should say duty, of withdrawal of a bad instruction is recognized in *McKelvey* v. *C. & O. Ry. Co.*, 36 W. Va. 500. 2 Thompson on Trials, section 2326, sustains this power in a court. If it did not exist, it would be a misfortune. The rule contended for by counsel would frustrate tedious, costly trials and obstruct the administration of justice. Substance must not always yield to technicality.

Complaint is made of refusal of defendant's instruction six bearing on self defense. It leaves out in connection with retreat the element of good faith, and in saying that the defendant may kill when he has reasonable ground to believe that there is designs to destroy his life or commit a felony, it omits the words "and does believe." The "good faith" feature was important. in the case, because evidence showed that when Hood backed some steps from Barnes, he told his son to get his gun, and told his son to shoot Hood, and he was shot just then, tending to show that such retreat as there was was not in good faith. *State* v. *Zeigler*, 40 W. Va. 594. Other instructions given practically cover this instruction so far as the case demanded.

Complaint is made of the refusal of instruction No. 8, saying that "if they are satisfied from the evidence that when Hezekiah Hood retreated from the post hole Barnes armed with a revolver fired the same off one or more times thereby assaulting the defendant, and that the defendant had cause to believe and did believe that great bodily harm was about to be inflicted upon him, and that under such belief and fear he fired the shot with intent to protect himself," then he was not guilty. It is said that this Court approved that instruction in *State* v. *Hobbs*, 37 W. Va. 812. I suppose instruction No. 4 is referred to. Perhaps that instruction was right in that case; but the instruction under consideration differs from that in the *Hobbs case*, because it assumes that Hood retreated, which is not an element of the instruction in the *Hobbs case*. And it leaves out the words "retreated in good faith," and it assumes that by firing the pistol Barnes assaulted Hood. Other instructions cover self defense.

Complaint is made of the giving of an instruction for the state defining reasonable doubt and containing the clause,

"The oath of a juror imposes upon him no obligation to doubt where no doubt would exist, if no oath had been ad-. ministered." It is said that this is plain error, as telling the jury that the oath imposed no obligation. It is instruction four in *State* v. *Bickel*, 53 W. Va. 599, and was held no error in that case. We do not think this is error. We find this test in many of the cases. It is put in note on page 491 of 12 Cyc. An oath does not compel a juror to doubt when he would not doubt on the same evidence as an honest man acting in a grave matter. The great Chief Justice Gibson, a polar star in judicial decisions, said that a juror is "not at liberty to disbelieve as a juror while he believed as a man." *Commonwealth* v. *Harmon*, 4 Pa. 270. Of course, he meant on the evidence, not outside the evidence. Also I find that in *State* v. *Kellison*, 56 W. Va. 690, it was held that the giving of such instruction is no error. The jury in this case were told over and over again that the State must prove Hood guilty beyond a reasonable doubt. I will add for myself, that as the verdict found Hood not guilty of murder in either degree, but guilty of voluntary manslaughter, and as there was no question that Hood shot and killed Barnes, and so stated himself as a witness, I do not see how the matter of reasonable doubt is involved in the case.

There are other instructions in the case, but they involve no principles of law not settled by numerous decisions in Virginia and West Virginia binding us, so that a discussion of these instructions would only be a rehash of law fixed and settled by them. If the case were to go back for another trial, it would be proper to say which instructions were good and which bad; but as the case does not go back, why write pages and pages to restate settled law? We have carefully examined the instructions and do not find any error therein.

Counsel discuss the evidence in this case and ask the Court to pass on it and determine whether the accused was guilty of manslaughter or excusable on self defense. As there was no question as to Hood's shooting Barnes, the question of self defense was one peculiarly for the jury. Witness after witness proves that, and the circumstances of the shooting. The deceased made his statement as to the

facts, the prisoner gave evidence as to the facts. Other witnesses gave evidence as to the facts of the homicide. The evidence is of much volume. The prisoner moved to strike out the State's evidence as being insufficient. By no means could that motion prevail. It was a case peculiarly proper to go before the jury. Of course, that motion could not prevail in the circuit court nor in this Court. In this Court it involves only the question whether Hood was entitled to the excuse of self defense. That was peculiarly a jury question. The trial was fair and the verdict supported by the evidence. The proper function of this Court, except in rare cases, is not to discuss facts, but lay down law principles for public guidance. It is not a jury to weigh and balance evidence.

Judgment affirmed.

*Affirmed.*